John S. Martin v. Commissioner.
Martin v. Commissioner
Docket No. 1068.
United States Tax Court
1944 Tax Ct. Memo LEXIS 217; 3 T.C.M. (CCH) 626; T.C.M. (RIA) 44198; June 7, 1944
*217 Joshua Freiberger, Esq., for the petitioner. J. Richard Riggles, Jr., Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: Petitioner contests the determination of deficiencies in income tax for the calendar year 1937 in the amount of $1,116.03. The first question considered is whether the Commissioner erred in disallowing, as a deduction under section 23(a) of the Revenue Act of 1936, as amended by section 121(a) and (e) of the Revenue Act of 1942, certain hotel expenses incurred by petitioner during the taxable year in the sum of $735.60 on the ground that they constituted "personal, living or family expenses" within the meaning of section 24(a)(1) of the Revenue Act of 1936. The next question is whether petitioner suffered, by disposing of his stock in Carvel Island Club, Inc., a loss from the sale or exchange of a capital asset within the meaning of sections 23(j) and 117(b) of the Revenue Act of 1936 and therefore subject to the limitations set forth in section 117(d) of the same Act; also, in that connection, whether in the alternative, the stock became worthless in the taxable year. The third question is whether the transaction by which *218 the petitioner purchased one share of the capital stock of Carvel Island Club, Inc., a New Jersey corporation, in 1928 for the sum of $1,300 was a transaction entered into for profit, so that the loss of $1,300 sustained by petitioner as a result of the subsequent disposition during the taxable year of that share of stock was deductible under section 23(e)(2) of the Revenue Act of 1936. From the evidence adduced we make the following Findings of Fact Petitioner is an individual who at all times during the taxable year resided in Locust Valley, Long Island, New York. He filed his personal income tax return with the collector of internal revenue for the third district of New York. During 1937 petitioner was employed by Time, Inc., as managing editor of Time, a magazine published weekly and having a large national circulation. He had, about a year earlier, been in charge of "March of Time" on the screen, also Life Magazine, and these new projects required his spare time during the taxable year. He had been employed by Time, Inc., since 1922. His salary as managing editor for 1937 was $45,500. Petitioner's business office was located at 9 Rockefeller Plaza, New York City. He *219 lived with his wife and children in Locust Valley, Long Island, New York, which was 33 miles from his office. His place of voting and his residence during 1937 were in Locust Valley. He commuted daily from Locust Valley to his office, except as will hereinafter appear. Trains ran regularly from New York City to Locust Valley during the evening and night until 12:25 a.m. After that, there was not another train until 5:22 a.m. The usual time required to go by train from New York City to Locust Valley was one hour. Petitioner owned a cooperative apartment house located at 1172 Park Avenue, New York City, but he had not lived there since 1928. During 1937 that apartment house was fully rented. Time Magazine was published weekly. The deadline for publication each week was 1 or 2 o'clock Tuesday morning. Tuesdays and Wednesdays were petitioner's holidays. Thursday was assignment day, and Friday was research day. On Thursdays and Fridays, petitioner usually did not work later than 6 p.m. However, Saturday, Sunday and Monday were writing days and the petitioner's duties required him to work on these days until midnight and often as late as 1 or 2 o'clock in the morning, and then to report *220 at his office the following mornings Sunday and Monday, by about 10 a.m. Petitioner's duties were onerous and mentally and physically fatiguing. He had not had a rest for several years, until August 1937, when "it was judged best by all hands" that he take a rest and he took a vacation. During 1937, he stayed overnight Saturday and Sunday nights of almost every week at the Barclay Hotel, located six blocks away from his office. He did not have a standing reservation at the hotel, but was always able to get a room for which he paid $5 a night. During 1937, he paid the Barclay Hotel the sum of $2,090.41 for board, room, telephone, entertainment, etc. Of this sum of $2,090.41, the petitioner paid the sum of $735.60 for his own board and room for which he was not reimbursed. In connection with his 1937 income tax return he deducted from the salary received from Time, Inc., the sum of $2,303.79 as "Entertainment, Telephone, and local traveling expense for which I am not reimbursed." The sum of $2,303.79 included the $735.60 which the Commissioner disallowed as a deduction, allowing deduction of the remainder. On November 14, 1928, the petitioner purchased one share of the capital stock *221 of Carvel Island Club, Inc. (hereinafter sometimes referred to as the "Corporation") for $1,300. The Corporation was organized under the laws of New Jersey on July 16, 1927. Its total authorized capital stock consisted of 100 shares of common stock without par value. Section 3 of the Corporation's certificate of incorporation enumerates the objects for which it was formed, as follows: "To carry on the business of hunting, fishing, farming; "To experiment in the propagation of fish and game; "To provide a place of recreation for the stockholders, their wives, husbands, children and guests; and "To acquire, by grant, gift, purchase, devise or bequest, both real and personal property and the holding, mortgaging, and disposing of such property, real and personal, and rights privileges therein, as may be necessary to carry on the objects for which this corporation is formed, whether such property be located within or without the State of New Jersey, subject, always to such limitations as may be prescribed by law in relation thereto; "To improve, manage and operate real property; the building, construction and alteration of houses and other structures thereon, and the development of *222 real and property generally, the buying, selling and exchanging of real property, the renting and leasing of real property, improved and unimproved; to make all mortgages of real property and borrowing money thereon by mortgage or otherwise, the loaning of money upon real property and the taking of mortgages and assignments of mortgages of the same; the buying, selling and dealing in bonds and loans secured by mortgage or other liens on real property; the purchasing, manufacturing, acquiring, holding, owning, mortgaging, pledging, leasing, selling, assigning and transferring, investing in, trading in, and dealing in goods, wares, merchandise and property of every kind and description, and the carrying on of any of the above businesses or any other business connected therewith, wherever the same may be permitted by law, either manufacturing or otherwise, and to the same extent as the laws of this state will permit, and as full and with all the powers that the laws of this state confer upon corporations and organizations under said act, and to do any and all of the business above mentioned and set forth to the same extent as natural persons might or could do. "The corporation shall *223 have the power to conduct its business in all its branches, have one or more offices, and unlimitedly to hold, purchase, mortgage and convey real and personal property in any state, territory or colony of the United States and in any foreign country or place." The Corporation sold 16 shares of its capital stock, one share to each of 16 individuals (including the petitioner). The 16 individuals were selected because of their interest in the sport of duck shooting on land owned by the Corporation, and in the use of the facilities of a clubhouse which the Corporation built and maintained on other land owned by it. The Corporation never issued more than 16 shares, never had more than 16 shareholders, and it was understood by the original shareholders that the number of shareholders would not be increased. Shortly after its organization in 1927, the Corporation purchased two islands, containing 10 acres, located in Barnegat Bay, off the New Jersey coast about 50 miles north of Atlantic City, for $10,000. The Corporation also purchased, a year after its organization, a lot, 50 feet by 100 feet, on the mainland located in Surf City, New Jersey, about 500 yards from the islands. This lot *224 was purchased for the sole purpose of erecting a clubhouse and building a dock. The clubhouse contained one large sitting room, a locker room, a bath, a kitchen, and a small bunk room for the caretaker. It was well equipped, could be heated, had running hot and cold water, and electric lights. Shareholders with their families would occupy the clubhouse occasionally for a period of a week or two. The dock was utilized by the shareholders in connection with the boats used to get to and from the islands. The Corporation never acquired any additional real estate. These two islands had only six points of advantage from which the sport of duck shooting could be carried on, and they were equipped accordingly. The duck shooting season lasted only 30 days. Being a shareholder was a necessary prerequisite to using the facilities which the Corporation had for this sport. From the sporting angle, it would have been impractical for the Corporation to have had more than 16 shareholders. The two islands consisted of meadow grounds on which salt hay grew. The land was not suitable for building operations unless it was filled with sand pumped from the bay. No building operations were ever conducted *225 on the two islands. Subdivision of the islands into lots and their sale was never contemplated and no attempt was ever made to do so. Although there was something of a boom in real estate in the vicinity of the property purchased, and a rumor that the road from New York City to Atlantic City, New Jersey, might be routed near the land purchased by the Corporation, and the original stockholders and petitioner had hope of increase in value of the property, the property was purchased primarily because of the facilities it afforded for the sport of duck shooting. It was not income-producing land. The principal purpose for which the Corporation was organized was to provide a place of recreation for its stockholders, especially to enable them to engage in the sport of duck shooting, and not primarily to conduct a real estate business, or for profit. The Corporation never had income. Its expenses, such as taxes, repairs on the clubhouse, improvements, and caretaker, were met through assessments made upon the shareholders. If these assessments were not paid they constituted a charge against the stock. At least two such assessments, one in 1936 and one in 1937, were made against petitioner, *226 and at least one such assessment was outstanding against his share of stock when he, as below stated, surrendered it. The by-laws of the Corporation provided that a shareholder had to sell his stock to the Corporation; he could not sell his stock on the open market. The shareholders of the Corporation were not interested in investigating the possibilities of selling the two islands for $25,000 when such an opportunity presented itself late in 1928 or early in 1929. Since the depression in the autumn of 1929, the property was unsalable, and in 1937 the shares of the Corporation had no liquidation value or other value. At that time the Corporation's balance sheet showed a deficit and the Corporation was insolvent. In 1937 the petitioner turned his share of stock into the Corporation, for a nominal consideration of $1.00, which canceled the assessment then outstanding against it. At the time he purchased this stock, petitioner was interested in the sport of duck shooting. He played golf and belonged to a golf club. He knew that the two islands owned by the Corporation possessed physical features which made them naturally adaptable for duck shooting and that blinds had been erected *227 at advantageous points so that the shareholders could participate in that sport. During the period when he was a shareholder in the Corporation, petitioner used the clubhouse and engaged in the sport on five or six occasions. The petitioner in purchasing a share of the capital stock of the Corporation did not enter into the transaction primarily for profit; his principal purpose was to engage in the sport of duck shooting and otherwise to use the recreational facilities of the Corporation which, as a shareholder, he had the right to do. In connection with his 1937 income tax return, petitioner claimed a deduction of $1,300 as loss sustained when he gave up his stock in the "Carvel Island Club" (the Corporation), when the latter "became insolvent in 1937." Petitioner also claimed, in connection with his 1937 income tax return, a loss from the sale or exchanges of securities in the amount of $2,331 (loss of $35,142.25 over gains of $32,811.25), and was allowed a deduction in that respect in the amount of $2,000, which was the maximum allowed by section 117 (d) of the Revenue Act of 1936. Opinion We first consider petitioner's contention that the sum of $735.60 which he incurred for *228 board and room in a hotel in New York City during the taxable year 1937 is deductible, under section 23(a) of the Revenue Act of 1936, as amended by section 121(a) and (e) of the Revenue Act of 1942, which provides as follows: SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or business expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; * * * Respondent, however, contends that the sum of $735.60 so expended by petitioner is not deductible because of section 24(a)(1) of the Revenue Act of 1936, which provides as follows: SEC. 24. ITEMS NOT DEDUCTIBLE. (a) General Rule. - In computing net income no deduction shall in any case be allowed in respect of - (1) Personal, living, or family expenses. Respondent concedes that the $735.60 in dispute represents living *229 expenses of petitioner while in New York City, to wit, meals and hotel accommodations. We are of the opinion that the hotel expenses incurred by petitioner in the instant case are not allowable as a deduction under section 23(a), as amended. In the case of , this Court stated that "In the opinion of the Board, traveling and living expenses are deductible under the provisions of this section only while the taxpayer is away from his place of business, employment, or the post or station at which he is employed, in the prosecution, conduct, and carrying on of a trade or business. A taxpayer may not keep his place of residence at a point where he is not engaged in carrying on a trade or business, * * * and take a deduction from gross income for his living expenses while away from home. We think section 214(a)(1) [1921 Revenue Act] intended to allow a taxpayer a deduction of traveling expenses while away from his post of duty or place of employment on duties connected with his employment." The petitioner's expenses in the instant case were not incurred while he was "away from his post of duty or place of employment." The *230 Bixler case has since been consistently followed. , affd., ; ; ; . The cases cited by the petitioner ( ; ; , and the more recent cases of , and , are clearly distinguishable. The petitioner herein had the hotel expense, as he had car fare to and from his home, only because of maintaining his home at a distance from his business. The petitioner further contends that in the taxable year he sold for $1.00 a share of the capital stock of Carvel Island Club, Inc., which stock he had purchased for $1,300 in 1928. He therefore claims deduction of $1,300, under section *231 23(e)(2) of the Revenue Act of 1936. [1] Although we have set forth in full the facts involved in this question, we think it would be superfluous to dwell upon more than the following: In addition to the $1,300 claimed under this hearing, the petitioner claimed and was allowed, to the extent of $2,000, capital losses on other sales and exchanges of securities as indicated by the return and the deficiency notice. The stock was a capital asset under the definition furnished by section 117(b) of the pertinent Revenue Act, and under section 117(d), losses from sales or exchange of capital assets are allowable only to the extent of $2,000, plus gains from such sales or exchanges. Therefore, assuming that the disposition of the petitioner's share of stock was, as he alleges in his petition and states in his brief, "sold" in 1937, we have under this question merely a sale of capital assets in addition to the sales of capital assets reported by the petitioner, and since he has already been allowed the maximum of $2,000 losses, no additional loss can be allowed. If, on the other hand, it be considered that the disposition of stock was not by way of sale or exchange, so that the matter is viewed *232 merely as one of the stock becoming worthless, it is altogether clear from the record that no showing is made that the stock became worthless in 1937, or possessed value at the close of the previous year. On the contrary, the record indicates that the stock became worthless prior to 1937, and after the depression of 1929, when "property of that kind became practically unsalable," in the words of petitioner's witness. At any rate, if the matter is viewed as one of worthlessness of stock, value in the stock at the close of 1936 is not shown. It thus appears that whether there was sale or not, petitioner may not, upon the record before us, be allowed loss from the disposition of the particular asset here in question. We therefore need not discuss the question as to whether the stock was acquired, or the loss incurred in a transaction entered into for profit, within the terms of section 23(e)(2) of the Revenue Act of 1936. However, examination of the facts convinces us that the petitioner fails to meet his burden to show a transaction entered into for profit. . *233 This Court held in the case of , that in order to be entitled to a deduction under this section, "The profit motive must be the prime thing. ; . Cf. . The determination of each case, however, must depend upon its particular facts. . Cf. ." The evidence in the instant case establishes that the Corporation was primarily organized to enable its shareholders to participate in the sport of duck shooting. The only property it ever acquired was for that purpose. The two islands were not only unsuitable for building purposes, without further work done on them, but also they were not income producing. The stock which petitioner purchased could not be sold on the open market, but had to be sold to the Corporation, a situation in some degree inconsistent *234 with the existence of a business purpose on the part of petitioner in acquiring this stock. Petitioner was interested in the sport of duck shooting and did, in fact, participate in it, using the facilities of the islands and of the clubhouse, which he was entitled to do as a shareholder. That the Corporation was not primarily engaged in the business of real estate speculation is indicated by the fact that its shareholders never contemplated subdividing the islands into lots and offering them for sale, and the fact that its shareholders were not interested in disposing of the islands at a substantial profit when such an opportunity presented itself. The provisions contained in the Corporation's certificate of incorporation, indicating a business purpose, are negatived by what actually took place in this case. That the corporate name included the word "Club" is not wholly without significance, though we ascribe little weight to it. Even though the petitioner had some business motive in purchasing this share of stock because of the land boom then in existence at the time of his purchase and because of the rumor that a road from New York City to Atlantic City was to be built, which might *235 enhance the value of the Corporation's property, that motive was not the prime motive requisite, under the above authority, to allowance of the deduction. The deduction of the $1,300 is denied. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME: In computing net income there shall be allowed as deductions: * * * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - * * * * *
(2) if incurred in any transaction entered into for profit, though not connected with the trade or business.↩